

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEPHANIE OLSON, )
)
      Plaintiff, )
)
                         )    No. 08 C 0996
vs. )
)    Magistrate Judge Schenkier
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

In this Social Security Appeal, Stephanie Olson ("plaintiff" or "Mrs. Olson"), seeks reversal

and/or remand of a denial by the Commissioner of Social Security ("defendant" or "the

Commissioner") of her claims for Disability Insurance (Title II) Benefits ("DIB") and for

Supplemental Security Income ("SSI") payments for an alleged disability. Plaintiff filed an

application for DIB and SSI payments on March 22, 2005, alleging she became disabled on

December 31, 2003, due to a combination of impairments including left lower extremity pain, mild

mental retardation, and a learning disability (Pl.'s Mem. at 1). Plaintiff's application was denied on

June 21, 2005 (R. 51), and was denied on reconsideration on August 26, 2005 (R. 57).

On June 21, 2007, a hearing was held before an Administrative Law Judge ("ALJ") (R. 20).

The ALJ denied plaintiff's disability claim in a written decision dated July 24, 2007 (R. 31).

Plaintiff sought review of the ALJ's decision by a timely request for review of the hearing decision

---

[1] Pursuant to the consent of the parties and 28 U.S.C. § 636(c), on June 2, 2008, this case was assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 13, 16).

(R 15). The Appeals Council denied this request on January 29, 2008 (R. 6), making the ALJ's decision the final decision of the Commissioner. This appeal followed.

Plaintiff now seeks summary judgment reversing the Commissioner's decision or, in the alternative, remanding the case for further proceedings (doc. # 24). The Commissioner has filed a cross-motion for summary judgment to affirm the decision below (doc. # 29). For the reasons stated below, the Court grants plaintiff's motion for summary judgment, remanding the case for further proceedings, and denies the Commissioner's motion for summary judgment.

I.

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2008). A claimant must demonstrate that her impairments prevent her from performing his past work and any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The social security regulations outline a five-step test for determining whether a claimant is disabled: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step Three or Five. A

2

negative answer at any step other than Step Three precludes a finding of disability. *Young*, 957 F.2d at 389. At Steps One through Four the claimant bears the burden of proof; the burden of proof then shifts to the defendant at Step Five. *Id.*

In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept an ALJ's findings of fact when they are supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). The Court cannot substitute its determinations for that of the defendant or the ALJ where conflicting evidence allows reasonable minds to differ. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). The Court is limited to determining whether the defendant's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of HHS*, 969 F.2d 534, 538 (7th Cir. 1992).

That said, an ALJ's decision does not receive unlimited judicial deference. An ALJ may not select and discuss only the evidence that favors his or her decision; the ALJ must consider all relevant evidence. *See Herron*, 19 F.3d at 333. While this obligation does not require an ALJ to specifically discuss every piece of evidence, an ALJ nonetheless must provide a "logical bridge from the evidence to [her] conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). An ALJ must articulate the reasons for rejecting evidence "within reasonable limits." *Young*, 957 F.2d at 393.

3

## II.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. We summarize in turn relevant evidence concerning plaintiff's personal and work history (Part A), plaintiff's physical (Part B) and psychological (Part C) history, and the hearing testimony (Part D).

### A.

Plaintiff was born on October 6, 1974, making her 32 years old at the time of the hearing (R. 70). The plaintiff is single and lives with her mother and her brother (R. 367). She graduated from high school, during which time she was enrolled in special education classes (R. 368-69). She has taken college courses at Harry S. Truman College, City Colleges of Chicago (R. 153). Her previous work experience includes positions as a child care worker. Plaintiff was employed as a child care worker up to her alleged disability onset date of December 31, 2003 (R. 85).

After her onset date, plaintiff held various jobs, but apparently not on a full time basis and not for an extended duration. She worked at Central Evanston Child Care from January to April 2004, for 12 hours per week (R. 111); as a food service stocker in July 2004 for nine hours a week (R. 111); and at Little People Day Care and Kindergarten sometime in 2007 – the precise dates of that employment are unclear (R. 155). According to the manager of that facility, Ms. Olson held the job for one month but then "stormed" into the manager's office in a "burst of anger" and quit (R. 155).

### B.

In 2001, Ms. Olson broke her left leg in a fall (R. 171). The medical records indicate that on February 1, 2001, plaintiff underwent surgery to repair that break; the surgery involved the insertion

4

of an intermedullary rod to stabilize the leg (R. 171). Ms. Olson's surgeon, Dr. Steven Haddad, wrote a series of progress letters indicating his satisfaction with plaintiff's recovery (R. 161-81).

As part of the treatment for her leg injury, Ms. Olson received 25 physical therapy treatments between April 3, 2001 to June 18, 2001 (R. 177). In a letter dated July 16, 2001, Dr. Haddad noted that the fracture was completely healed and the plaintiff "walks with barely a limp" (R. 162).

However, there is evidence that Ms. Olson's leg condition thereafter regressed. Plaintiff's treating physician, Dr. Fauzia Lodhi, completed an Arthritic Report for the Bureau of Disability Determination Services on May 26, 2004, reporting edema, swelling, and mild atrophy of the left leg (R. 184). Dr. Lodhi denoted leg pain limitations in doing repetitive reaching, handling or fingering (*Id.*).

On June 28, 2004, Dr. Angelito Bernardo completed an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services (R. 187). In his report, Dr. Bernardo noted that plaintiff "walks with a slow gait and a limp favoring her left knee" (R. 189). Dr. Bernardo reported "tenderness and swelling of the left knee" and "decreased range of motion in the left knee joint" (R. *Id.*). Dr. Bernardo also noted that plaintiff evidenced a speech problem, but he was able to understand plaintiff approximately 98 percent of the time (R. *Id.*).

In January 2005, plaintiff was taken to the emergency room at Evanston Hospital as a result of her alleged need for pain medication for her leg (R. 376). Plaintiff was given Tylenol and discharged in good condition (R. 300). There is no indication that plaintiff has been prescribed or has taken any medication stronger than Tylenol since that time; nor is there any indication that she has been prescribed any assistive devices for walking.

5

Plaintiff also underwent an internal medicine evaluation on May 20, 2005 with Dr. Fauzia Rana (R. 239). Dr. Rana reported a diagnostic impression of possible degenerative arthritis (R. 241). However, Dr. Rana reported no signs of acute inflammation or significant limitation of movement because of pain at the time of the evaluation (*Id.*). Dr. Rana noted that the plaintiff had a normal gait and her speech was slightly slurred but understandable (*Id.*). Dr. Rana also stated, as part of his diagnostic impression, that Ms. Olson may have a learning disability (*Id.*).

On June 9, 2005, Dr. Boyd McCracken completed a Physical Residual Functional Capacity ("RFC") Assessment (R. 244). Dr. McCracken concluded that the plaintiff can occasionally lift up to 20 pounds, frequently lift or carry up to 10 pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour workday (R. 245). Dr. McCracken concluded that plaintiff had no impairment in fine/gross manipulation and, while plaintiff had a mild speech delay, "her speech is 100% understandable [with] a slight slurring" (*Id.*). Dr. McCracken also stated that plaintiff was able to stand and walk without assistance, but she was limited to occasional climbing of ramps and stairs and could never climb a ladder, rope, or scaffolds (R. 246).

Plaintiff's treating physician, Dr. Lodhi, provided a Medical Source Statement of Ability to do Work-related Activities (physical) dated July 4, 2006 (R. 276-79). Dr. Lodhi's conclusions differed in many respects from that of Dr. McCracken. Dr. Lodhi concluded that plaintiff was limited in lifting and carrying both occasionally and frequently to a maximum of less than 10 pounds (R. 276), and was limited in standing and walking to less than two hours in an eight-hour workday (*Id.*). No explanation was included in the section of the statement form asking for medical/clinical findings that support the conclusion (*Id.*). Dr. Lodhi also noted further limitations under postural

6

limitations, concluding that the plaintiff could occasionally perform activities like climbing, balancing, kneeling, crouching, crawling, and stooping (R. 277). Dr. Lodhi indicated that Ms. Olson is limited in manipulative functions, including reaching in all directions, handling, fingering, and feeling; he also indicated that the plaintiff is limited in speaking (R. 278).

## C.

Ms. Olson underwent a Psychological Evaluation for the Bureau of Disability Determination Services on June 28, 2004 (R. 194). Dr. Janice Friedman diagnosed plaintiff with mild mental retardation (R. 197), reporting that she had a full scale I.Q. of 69, a verbal I.Q. of 76 and a performance I.Q. of 67 (R. 195). Dr. Friedman also concluded that the plaintiff was far below average in the following abilities: conceptualizing verbally, immediate auditory memory, fund of information, identifying details, visual motor speed, visual motor coordination, visual information processing, and abstract reasoning (R. 197).

Dr. Carl Hermsmeyer completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment dated August 10, 2004 (R. 207-23). Dr. Hermsmeyer concluded that the plaintiff had mild limitation in daily living activities, moderate limitation in maintaining social functioning and moderate limitation in maintaining concentration, persistence, or pace (R. 217). Dr. Hermsmeyer indicated that plaintiff's ability to understand and remember detailed instructions was moderately limited, as was plaintiff's ability to carry out detailed instructions (R. 221). Dr. Hermsmeyer noted, however, that the plaintiff was not significantly limited in her ability to maintain attention and concentration for extended periods (*Id.*). In the assessment conclusions, Dr. Hermsmeyer stated that the plaintiff "has an I.Q. in the mildly retarded range – the MSE [and] the ADL indicate she has the mental capacity to perform simple tasks" (R. 223).

7

In a Psychiatric Review Technique dated June 15, 2005, Dr. John Tomassetti reported that plaintiff has mild functional limitations in activities of daily living and maintaining social functioning (R. 262). Dr. Tomassetti also noted that plaintiff has moderate limitation in maintaining concentration, persistence, or pace (R. 262). In a Mental Residual Functional Capacity Assessment dated June 15, 2005, Dr. Tomassetti reported that plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions (R. 266). Dr. Tomassetti also noted that plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods (R. 266), but she had "no gross limiting factors" socially or adaptively (R. 268). Dr. Tomassetti concluded that plaintiff "has the capacity to perform simple/routine, unskilled activities" (R. 268).

Plaintiff had a psycho-educational evaluation with National-Louis Center for Learning ("NLC"), that took place on five dates between September 29, 2006 and November 10, 2006; the report of the evaluation is dated December 18, 2006 (R. 326). The evaluation of the plaintiff involved the following assessment procedures and instruments: Wechsler Adult Intelligence Scale – Third Edition, Woodcock-Johnson Tests of Achievement, Standard Battery; Thematic Apperception Test; Social Skills Rating System; Myers-Briggs Type Indicator; Vineland Adaptive Behavior Scales – Second Edition; Sentence Completion; and Clinical Interview (R. 327). In intellectual functioning, the plaintiff received a full scale I.Q. of 80 and a verbal I.Q. of 88 (R. 328). The report notes the chances that the range of scores from 76-84 for the full scale I.Q. and 84-92 for the verbal I.Q. include the plaintiff's true abilities in those areas are "95 out of 100" (Id.). The report noted that the areas that appeared to be "most problematic" for the plaintiff are "receptive language and affective functioning" (R. 332).

8

The report states that plaintiff's "academic and vocational history shows a pattern of communication misperceptions which then escalate into verbally abusive behaviors when [the plaintiff] is not getting what she wants or feels that she deserves" (R. 332). Plaintiff scored below the 1st percentile for Adaptive Behavior Composite, including a score in the 1st percentile in Daily Living Skills (R. 331). Plaintiff's communication domain was ranked at less than 0.1 percentile and was noted to be a highly significant weakness, summarizing her receptive, expressive, and written language abilities (*Id.*). Plaintiff's scores were in the average range for processing speed index providing information on visual processing, planning and organizational ability, cognitive flexibility, visual memory, visual-motor coordination and visual selective attention (R. 329).

According to the NLC report, the plaintiff's speech processes were often hard to follow, because she spoke so quickly (R. 327). Additionally, the plaintiff became frustrated with the length of time it took to complete the evaluation and made abusive phone calls and sent abusive emails to the examiner and director of the NLC (R. 328). The evaluators noted the plaintiff had a minimal capacity for self-control (R. 332). The evaluators recommended plaintiff engage in speech and language therapy in addition to social skills training or therapy for her weaknesses in affective impulses (R. 333).

In their summary, the evaluators stated that the plaintiff "appears to be functioning at a low average intellectual functioning," noting the full scale I.Q. of 80 and the WJ-III-ACH score of 89 (R. 332). The evaluators also noted that the plaintiff's strengths include the ability to engage in appropriate social skills and affect (*Id.*). The following recommendations were made:

1.     [that plaintiff] be given a thorough explanation of her strengths and weaknesses to develop a realistic appraisal of her abilities.

9

2.    [that plaintiff] be given social skills and emotional regulation training to assist in improving deficits.
3.    [that plaintiff] be given a speech and language assessment.
4.    [that plaintiff] be provided the opportunity to meet with a clinical psychologist to investigate the possibility of a personality disorder where medication may or may not be warranted.

(R. 333).

The record indicates two other incidents that provide some evidence of plaintiff's alleged difficulty in controlling her temper. The first incident occurred on January 23, 2005, when plaintiff was taken into police custody due to an altercation with a friend; the charges later were dropped (R. 376). The second incident involved the episode at the Little People Day Care and Kindergarten, Inc., when plaintiff reportedly "stormed" into the manager's office in a "burst of anger" and quit her job.[2]

### D.

During the administrative hearing on June 21, 2007, the ALJ received testimony from two witnesses: plaintiff and William Newman, a vocational expert ("VE"). We summarize their testimony in turn.

### 1.

Plaintiff testified that, as of the time of the hearing, she received no income, nor any food stamps (R. 368). Plaintiff does not have a driver's license, because she could not pass the written test; so, she takes the bus or has her mother drive her when she needs to run errands (Id.).

Plaintiff testified she had attended some college at Truman College, but that she had taken off the summer and was not taking classes at the time of the hearing (R. 369). Plaintiff said she only took two or three classes at a time at Truman College, because she is "unable to handle and do the

---

[2]We note that plaintiff testified that she did not recall this episode (R. 371).

work for the classes" (R. 385). Plaintiff testified that the last book she read was *Hayfire,* which she found hard to understand (R. 384). Plaintiff testified that it is difficult for her to understand instructions and learn new things (R. 386). Plaintiff testified that she normally gets Cs for grades and has "some problems" concentrating, remembering materials for class, and doing homework (R. 385). Plaintiff also testified that she has difficulty with speech, and people ask her to repeat things (*Id.*).

The ALJ inquired into plaintiff's work history, including why plaintiff had left the Children's Discovery Center job (R. 75). Plaintiff testified that she was "unable to handle [it]," because "the staff there never communicated with [her about]... what... to tell the parents when they came" (R. 371-72). Plaintiff reported that she had been fired from that job, because when they wanted to use her as a floater, she expressed that she did not want this job (R. 372). She also testified that she worked limited hours at the child care center, because she was unable to keep longer hours (R. 385).

When asked by the ALJ if she thought she could do a job cleaning hotel rooms, plaintiff responded: "I should be, as long as it's not lifting too much weight" (R. 373). Plaintiff noted that she looked for or applied for jobs during 2007, but the jobs she applied for all required more experience or education than she had (R. 374).

The ALJ questioned plaintiff about her alleged physical limitations. Plaintiff testified that the pain is in her left leg "from the knee down to the ankle," and it "comes and goes" (R. 378-79). Plaintiff said her condition has gotten "a little worse" since the last time she saw Dr. Haddad (R. 374). She described the pain as stabbing pain that occurs about once a day and lasts for ten to fifteen minutes (R. 379). Plaintiff takes Tylenol when it hurts, which "lessens the pain" (*Id.*). Plaintiff said

11

she sometimes puts ice on the knee or wraps it in an ace bandage (R. 380). Plaintiff testified she was not experiencing any other pains or symptoms at the hearing (*Id.*).

Plaintiff testified that the pain is worse when she is standing or walking (R. 379), and that she can lift no more than ten pounds because the weight affects her leg (R. 381). Plaintiff testified that she could "probably" walk one block and does not use a cane or any other assistive device for walking (R. 380). But, plaintiff said she could stand for "no more than half an hour" at one time (*Id.*). Plaintiff also testified that it is difficult to climb stairs and after a couple flights of stairs her leg would bother her (R. 387). Plaintiff testified that she sometimes, but not always, experiences pain when sitting down (R. 379).

Plaintiff said she could sit for "about a half an hour or so" at one time (R. 380). When the ALJ asked why she could only sit for a half an hour, plaintiff answered that she cannot rest and agreed with the ALJ when the ALJ asked: "It's not because of pain, though, it's because you just get fidgety?" (R. 380-81). However, when the plaintiff's attorney asked follow-up questions, plaintiff said her leg hurts and stiffens after sitting for about a half an hour to an hour, and that she needs to stand for about a half an hour before sitting again (R. 386).

Plaintiff testified about her daily routine and life activities (R. 381). Describing her typical day, plaintiff said she gets up, dresses, makes her bed, eats, and then usually watches TV or goes outside (*Id.*). Plaintiff testified that she makes small, simple meals and does "some dusting" in her own room (*Id.*). She does her own dishes when she makes her own meal and does her own laundry (R. 381-82). Plaintiff testified she does some grocery shopping (usually using a lists from her mother of what to purchase) and is able to make change (R. 382, 384).

12

Plaintiff said she enjoys spending time with friends, hearing music in the park or going for coffee, to dinner, or to the movies (R. 382). The friends with whom plaintiff socializes are from a program called "Step Out," which assists "people who have different learning disabilities" (R. 384).

Plaintiff denied having a problem controlling her anger (R. 378), and said she could not think of a situation when she got mad at another person (R. 385-86). Plaintiff did acknowledge that she finds it difficult to deal with criticism (R. 386). Plaintiff denied feeling depressed or anxious, and she stated that she did not have a problem in that she acted impulsively (R. 378, 380). Plaintiff said she did not recall storming in a manager's office at the Little People Day Care and Kindergarten in a rage (R. 371). When asked about leaving abusive messages with personnel at NLC in connection with her psycho-educational evaluation, plaintiff did not deny she had left the messages but complained about how long the evaluation took (R. 378).

### 2.

The VE testified that plaintiff's past relevant work as a daycare worker was semi-skilled, light work (R. 388). The ALJ asked the VE about the work that could be performed by a person with the following RFC: a 32-year-old with the work experience and education of Ms. Olson, who had exertional limitations, including the ability to sit for six to eight hours a day, stand and walk at least six hours out of a day, lift and carry frequently up to ten pounds and occasionally up to twenty pounds, occasionally climb stairs and ramps (but never climb any ladders, ropes, and scaffolds), and perform jobs that are simple and routine (R. 388-89). The VE testified that a person with that RFC could not perform plaintiff's past relevant work, but could perform jobs such as a light housekeeper, cafeteria attendant, and light cashier (R. 389).

13

The ALJ then modified the hypothetical RFC to include the added limitation that the person should have no regular or general public contact, should be able to work primarily alone, and should be in a job that is not high stress and that does not require extensive talking (R. 389). The VE agreed that the cashier job would be precluded with these additional limitations (*Id.*), but cited a hand packer as an additional job available in the area that would meet the RFC hypothetical (R. 390).

The ALJ asked the VE to include in the RFC the following limitations reported by Dr. Lodhi's assessment: the person could not do the activity constantly but could do it occasionally and frequently, including limited ability in the upper and lower extremities for pushing and pulling and an ability to stand and walk less than two hours out of an eight-hour day (R. 390-91). The VE said a person with those additional limits could only do sedentary jobs; he identified sorter and assembler as jobs within the ability of someone with that RFC to perform (R. 391). The VE testified that the duties of those jobs are routine and involve short instructions, typically one or two steps (R. 393). The VE said the supervisors initially explain the job duties and then periodically check to ensure the workers are maintaining production (*Id.*). The VE said there was no ongoing supervision (and thus no need for the sorter or assembler to frequently interact with a supervisor) unless there was a problem (*Id.*). The VE testified that the jobs allow for sitting and standing options as long as the individual stays at the work station and performs her job (R. 395). The VE stated that it would not necessarily be a problem if a person had to change positions every thirty minutes (R. 395-96).

On cross-examination, plaintiff's attorney asked if the jobs the VE suggested could be performed if the individual also had moderate limitations in concentration, persistence or pace and in social function (R. 391). The ALJ directed plaintiff's attorney to frame the question as "hours during the day" it would take her off task (*Id.*). The VE testified that if the plaintiff were off task

14

more than five or ten minutes per hour, then she would have difficulty maintaining production requirements in the production jobs he had proposed (R. 392-93). The VE testified that it would not necessarily be a problem if a supervisor had to repeat instructions one time per day, but if the supervisor had to repeat instructions more than two times each day, then it would be a problem (R. 394).

The VE also testified that if a person had unexplained bursts of anger for a very short period that did not interrupt others or production, then the person might be employable, but anger outbursts "definitely could be a problem" (R. 394). The VE further indicated that if a person had problems controlling her temper, then it would be a problem if it interfered with production and/or with the people around her (R. 395).

### III.

In her opinion, the ALJ used the five-step sequential process in determining that plaintiff is not disabled. At Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 31, 2003 (R. 22). At Step Two, the ALJ decided the claimant has a severe combination of impairments including low average I.Q., left lower extremity pain, and mild speech impairment (R. 23). The ALJ stated in her decision that the claimant's mental impairment results in "more than slight functional mental limitations" (*Id.*).

At Step Three, the ALJ found the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*). The ALJ found that plaintiff's physical impairments did not meet or equal Listings 1.02A or 14.09, as her leg pain did not cause her to be unable to "ambulate effectively" (*Id.*).

15

The ALJ further found that plaintiff's mental impairments did not meet or equal Listings 12.02 or 12.05. The ALJ discussed whether plaintiff met two of the following criteria common to these listings: marked restrictions in daily living activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration (R. 23). In discussing these criteria, the ALJ explained that "marked" is defined as "more than moderate but less than extreme" (*Id.*). The ALJ found that, as to the first three criteria, plaintiff had mild to moderate – but not marked – limitations, and no episodes of decompensation (R. 23-24). The ALJ further found that Criterion B of Listing 12.05 was not met because plaintiff's I.Q. score was not 59 or less, and that Criterion C was not met because her I.Q. score was not between 60 and 70 and she did not exhibit "a physical or other mental impairment imposing an additional and significant work-related limitation of function" (R. 24).

The ALJ then discussed at length the record evidence to determine plaintiff's RFC. In so doing, the ALJ acknowledged the discrepancy between the I.Q. score of 69 recorded by Dr. Friedman in 2004 and the score of 80 recorded by NLC in 2006, explaining that he accepted the higher score because "[n]o individual can test higher than his or her actual I.Q.," and because it was the most recent I.Q. test (R. 29).

The ALJ also acknowledged plaintiff's episodes of impulsive actions when angry, stating that the NLC report indicated "difficulties in affective impulse control had resulted in willful implementation of abusive behaviors in order to attain what she wants" (R. 28-29). The ALJ also noted plaintiff's own assessment that she does not have a problem with anger and the absence of any medical recommendation of an anger management program (R. 26). In so noting, the ALJ did not

discuss whether NLC's recommendation that plaintiff undergo "emotional regulation training to assist in improving deficits" (R. 333) might fall with the more colloquial rubric of an "anger management program."

Based on her analysis, the ALJ found the plaintiff to have the following RFC:

The claimant has the residual functional capacity to perform light work, except she is limited to: climbing stairs/ramps on an occasional basis; performing job tasks that do not require climbing ladders, ropes or scaffolds; performing job tasks that do not require extensive talking; and performing simple, routine job tasks that involve no high levels of stress and allow for the need to work primarily alone, with no regular general public contact.

(R. 24). The ALJ stated that this RFC accommodated the plaintiff's limitations to the "greatest extent reasonably supported by the evidence" and that both the medical record "as a whole" and the "subjective record" do not support allegations of more severe limitations than those accounted for in the RFC (R. 29). The ALJ noted that the record did not include opinions from treating or examining physicians indicating that the plaintiff has limitations precluding all work; she rejected the treater's opinion that plaintiff was limited to sedentary work (*Id.*). The ALJ stated that the course of treatment pursued by the claimant's treating sources is not "consistent with what one would expect if the claimant were truly disabled," and that plaintiff's testimony of limitations beyond those expressed in the RFC were not entirely credible (*Id.*).

The ALJ then turned to Step Four, finding that plaintiff could not perform her past work (R. 29-30). At Step Five, however, the ALJ found that, with plaintiff's RFC, she could perform several

17

jobs that the VE said existed in significant numbers in the national economy: housekeeping (20,435); cafeteria attendant (20,666); and hand packer (29,978) (R. 30).[3]

IV.

Plaintiff contends that the ALJ's determination that Ms. Olson is not disabled is erroneous on five grounds. *First*, plaintiff contends the ALJ improperly ignored testimony of the VE favorable to the plaintiff (Pl.'s Mem. at 8-11). *Second*, plaintiff asserts the ALJ erred by selectively discussing results of psychological testing (Pl.'s Mem. at 11-12). *Third*, plaintiff argues the ALJ failed to properly analyze evidence of the plaintiff's anger and emotional problems (Pl.'s Mem. at 12-13). *Fourth*, plaintiff contends the ALJ improperly analyzed the plaintiff's learning disorder and intellectual functioning (Pl.'s Mem. at 13-15). *Fifth*, plaintiff claims the ALJ improperly rejected the treating physician's opinion (Pl.'s Mem. at 15-16). While we do not accept all of plaintiff's criticisms of the ALJ's opinion, we do agree that there are some shortcomings in that opinion that require a remand.

A.

The medical record contains two I.Q. tests for Ms. Olson, performed two and one-half years apart. The first, performed by Dr. Friedman in June 2004, gave Ms. Olson a full scale score of 69, with a verbal score of 76 and a performance score of 67 (R. 195). Listing 12.00(D) states that where an I.Q. test separately records full scale, verbal and performance scores, "the lowest of these is used

---

[3]We note that earlier the ALJ had noted that even if plaintiff's RFC were further restricted to permit only sedentary jobs, "there still exist a significant number of jobs the claimant can do" (R. 29). Although it would have been preferable for the ALJ to identify those jobs, in fact her statement is consistent with the VE's testimony that sorter and assembler positions are sedentary jobs that exist in significant numbers (R. 391).

in conjunction with listing 12.05." *See* 20 C.F.R. pt. 220, App. 1. With respect to the test administered by Dr. Friedman, that results in an applicable I.Q. score of 67.

The second I.Q. test, which was administered to Ms. Olson as part of the NLC study in late 2006, yielded different results. There, Ms. Olson received a full scale score of 80 and a verbal score of 88 (R. 328). There are various other scores listed in the NLC report, but we cannot tell which of them correlate best to the performance score on the test conducted by Dr. Friedman. In any event, none of the other scores recorded on the NLC test was lower than 80 (R. 328-29). Thus, under Listing 12.00(D), the applicable I.Q. score from the NLC test was 80.

This discrepancy between the I.Q. test scores reported by Dr. Friedman and by NLC was significant to the issue of whether plaintiff met or equaled a listing at Step Three. Listing 12.05 (Mental Retardation and Autism) can be satisfied by "a valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work related limitation of function. *See* Listing 12.05(C), 220 C.F.R. pt. 220, App. 1. In finding that plaintiff did not meet this listing, the ALJ stated that she "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function" (R. 24). At that point in the opinion, the ALJ did not discuss the I.Q. score of 67 reported by Dr. Friedman, or explain why that was not a "valid" score. However, later in her opinion, the ALJ acknowledged both the Friedman and the NLC I.Q. scores (R.28, 29). The ALJ stated that she relied on the NLC score of 80 because "[n]o individual can test higher than his or her actual I.Q.," and the NLC score reflected "most recent test results" (R. 29). The ALJ never explained her finding that plaintiff failed to meet the second prong of Listing

12.05(C), that is, that she had no physical or mental impairment that imposed additional and significant work related limitation of function.

Without specifically tying her criticism to Step Three, plaintiff nonetheless argues that the ALJ improperly played the role of a doctor in deciding that the I.Q. test score resulting from the NLC test trumped the I.Q. score reported by Dr. Friedman. We agree. While ALJs are responsible for resolving conflicts in the evidence, *Richardson v. Perales*, 402 U.S. 389, 399 (1971), in discharging that duty they "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). That is what the ALJ did here by stating the she relied on the NLC test because "no individual can test higher than his or her actual I.Q." (R.29).

We cannot accept the Commissioner's argument that when the ALJ's said that an individual cannot test more highly than his or her actual I.Q., she merely stated a settled medical fact and did not make an unauthorized medical finding (Def.'s Mem. at 8). The ALJ pointed to no evidence in the record to show that the medical profession accepts that I.Q. tests can never result in an individual receiving an unduly high score. Indeed, the ALJ failed to cite the statement in the NLC report that the full scale score of 80 indicated that a range of scores between 74 and 86 would include Ms. Olson's "true ability in this area . . . 95 out of 100" times (R. 328). That statement does not ascribe infallibility to the test results. And, while that statement certainly suggests a high degree of confidence that the full scale I.Q. score of 80 is a fair barometer of plaintiff's ability, presumably the same could be said about the applicable score of 67 that Ms. Olson received on the I.Q. test that Dr. Friedman administered. Likewise, to the extent that the ALJ's observation that the NLC test score was more recent than the score recorded by Dr. Friedman, the ALJ offered no medical evidence to

show that with respect to I.Q. tests administered to adults, more recent results are more reliable than results from tests administered a few years earlier.

The ALJ could not resolve the conflicts between the I.Q. test scores on her own, because an ALJ is not expert in the nuances of I.Q. tests. *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (holding that the ALJ was not a health professional or medical expert and improperly made a medical conclusion regarding a patient's mental health). The ALJ should have secured further expert medical evidence to guide her in resolving the evident conflict between the Friedman and NLC scores. *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (ALJ should have resisted the temptation to play doctor" and should have "summoned an expert").

We therefore remand the case so that the ALJ may obtain further expert medical evidence on the issue of the plaintiff's I.Q. scores.[4] In the event the ALJ finds that plaintiff has a valid I.Q. score that would place her within Listing 12.05(C), the ALJ also must explain why the evidence of record concerning plaintiff's physical restrictions, her limitations on concentration, and her outbursts of anger do not constitute "a physical or other mental impairment imposing an additional and significant work related limitation of function."

**B.**

Two non-examining agency psychologists (Drs. Hermsmeyer and Tomassetti) found that Ms. Olson has moderate limitations in the general category of concentration, persistence or pace (R. 217, 262). During the hearing, plaintiff's attorney attempted to ask the VE how those limitations would

---

[4] We note that plaintiff also criticizes the ALJ's failure to give consideration to various scores plaintiff recorded in sub-tests administered by the NLC (showing, for example, that plaintiff was in the 0.1 percentile for communications domain and the 1st percentile for daily living skills), and failed to give weight to plaintiff's alleged learning disorder (Pl.'s Mem. at 11, 13). In light of our decision, we do not pass on these arguments, but we invite the ALJ to look into these matters on remand.

21

affect Ms. Olson's ability to perform the jobs that the VE had identified (R. 391). However, the ALJ refused to permit the question to be framed in terms of "moderate limitations," explaining that "moderate really means nothing" and that, to be meaningful, the question should be put into terms of whether the limitations would "take her off task minutes during the day, hours during the day" (*Id.*). Plaintiff's attorney then asked the VE to state the least amount of time that plaintiff could lose concentration and still be able to keep the jobs the VE had identified (R. 392). The VE responded that since all the jobs he identified were production jobs, if plaintiff was "off task more than five or 10 minutes per hour, then it would be difficult for her to maintain production requirements" (R. 392-93).

We are sympathetic to the ALJ's effort to move beyond generalities, and to obtain more concrete evidence of how "moderate limitations" in concentration, persistence or pace would affect plaintiff's ability to work. The problem is that, having embarked on that effort, the ALJ failed to complete the task.

*First*, the ALJ failed to include any limits on concentration, persistence or pace (moderate or otherwise) in her RFC, and did not discuss that question in explaining how she arrived at the RFC. Indeed, at Step Three, the ALJ described plaintiff's limitations on concentration, persistence or pace as "mild," without addressing the opinions of Drs. Hermsmeyer and Tomassetti that her limitations were "moderate." Thus, we are not sure whether, in arriving at the RFC, the ALJ considered that plaintiff had moderate limitations in concentration, persistence or pace, and if not, why she rejected the opinions of the agency examiners.[5] This failure to offer even minimal articulation is problematic.

---

[5] We note that there is some ambiguity in Dr. Hermsmeyer's report, which at one passage describes Ms. Olson's limitations in these areas as "moderate" (R. 217), but elsewhere describes her as "not significantly limited" in sustained concentration and persistence (R. 221). Similarly, while Dr. Tomassetti also gave Ms. Olson an overall "moderate"

22

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (while the ALJ is not required to address every piece of evidence, she "must articulate some legitimate reason for [her] decision").

*Second*, the ALJ concluded that plaintiff could perform "simple, routine tasks," such as those required by the production jobs the VE identified; but, the ALJ failed to address the question of whether a person with moderate (or, for that matter, mild) limitations in concentration, persistence or pace would be off task for as much as five to ten minutes an hour in performing those jobs. Having required plaintiff's attorney to quantify the meaning of moderate limitations in terms of the amount of time that a person would lose focus on the task, and then having taken testimony from the VE that would support a finding in plaintiff's favor if such limitations are present, it was incumbent on the ALJ to then make findings as to how a moderate (or mild) limitation in the area of concentration and persistence would translate into lost work time. Since neither Dr. Hermsmeyer nor Dr. Tomassetti expressed their opinions of limitations in concentration in terms of the amount of lost work time, we can find no basis in the record as it now exists for the ALJ to convert the phrase "moderate limitations" into an amount of time during the work day that concentration (and thus focus on work) would be lost.

Thus, the ALJ needed additional medical evidence in order to reach those findings – medical evidence that she failed to obtain. "Case law in the Seventh Circuit holds that '[a]n ALJ may not simply select and discuss only that evidence which favors his [or her] ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence.'" *Smith v. Apfel*,

limitation in the general category of concentration, persistence or pace (R. 262), elsewhere he found her to be "not significantly limited" in many subcategories of sustained concentration and persistence, but moderately limited in the ability to carry out detailed instructions and to maintain attention and concentration for extended periods (R. 266). The ALJ's opinion does not address these variations, or their significance to the question of whether Ms. Olson's limits in concentration affect her ability to perform the jobs the VE identified. This is an area the ALJ should consider and address on remand.

23

231 F.3d 433, 438 (7th Cir. 2000) (citations omitted). *See also Golembiewski v. Barnhart*, 382 F.3d 721, 724 (7th Cir. 2004) (an ALJ may not ignore relevant evidence). This general rule has special force in cases where the ALJ invites the testimony and opinions of a VE at Step Five, but then disregards the testimony without discussion. *See, e.g., Griffin v. Massanari*, No. 00 C 7109, 2001 WL 1064476, *10 (N.D. Ill., Sept. 18, 2001).

This is true "even where evidence minimally impacts a claimant's functioning." *Jenkins v. Astrue*, 544 F. Supp. 2d 736, 741 (N.D. Ind. 2008). Here, by contrast, the VE's testimony on the question of the impact of limitations on plaintiff's ability to concentrate was not minimal, but was significant: if the answer was that moderate (or mild) limitations in concentration translates to more than five to ten minutes each hour, then plaintiff could not perform the jobs the VE identified. The ALJ plainly was required to address this testimony by the VE, which could have been determinative of the disability determination in a way contrary to the conclusion that the ALJ reached. *See Bailey v. Barnhart*, 473 F. Supp. 2d 822, 840; *see also Connor v. Shalala*, 900 F. Supp. 994, 1004 (N. D. Ill. 1995) ("Since the VE's testimony in this case was determinative to the ALJ's decision of 'not disabled,' her failure to address the VE's concessions in cross-examination must be remedied"). Moreover, it was the responsibility of the ALJ, and not plaintiff, to further develop the record as necessary to make those findings, since at Step Five, the burden of proof falls to the Commissioner. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

Perhaps the ALJ assumed that none of this mattered, because Drs. Hermsmeyer and Tomassetti also opined that plaintiff could perform simple tasks, was "not significantly limited" in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of

rest periods" (R. 222, 267). But, we do not know whether the ALJ in fact made that assumption; and, if she did, we do not know how (or if) the ALJ determined that this "not significantly limited" designation meant that the person these doctors found to be moderately limited in concentration, persistence and pace would not fall off work tasks – even simple ones – more than five to ten minutes each hour. This failure to build a logical bridge between the evidence and her conclusion requires that the case be remanded. *Zurawski*, 245 F.3d at 887. On remand, the ALJ should address the variations between certain of the opinions expressed in the Hermsmeyer and Tomassetti reports (*see* note 5, *supra*); should clearly explain whether, and why, she finds plaintiff to have mild or moderate limitations in concentration, persistence and pace; and should take additional evidence to determine how mild or moderate limitations in concentration translate into amount of lost time at work when performing simple tasks.

## C.

The Court rejects plaintiff's remaining arguments for remand. Plaintiff argues that the ALJ improperly analyzed her anger and emotional problems. However, plaintiff bore the burden of production at Step Three to produce evidence that her anger or emotional problems would interfere with work. The evidence of the plaintiff's temper is one incident of a burst of anger resulting in her quitting a daycare job, a separate altercation with a friend, and some "abusive" emails and calls to the psycho-educational evaluators at NLC (Pl.'s Mem. at 8). The ALJ's RFC finding – which includes the requirement that the plaintiff work primarily alone, in positions that do not involve high stress or regular contact with the public – addresses plaintiff's temper in a fashion supported by substantial evidence (R. 24).

25

Plaintiff also argues that the ALJ improperly rejected the treating physician's opinion. A treating physician's opinion is given deference, but it is only given controlling weight if it is well-supported by clinical and lab findings and not inconsistent with other substantial evidence in record. 20 C.F.R. § 404.1527(d)(2); *see also White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). Substantial evidence supports the ALJ's decision on this point, including the plaintiff's testimony of her daily activities, pain relief from over-the-counter medication, and the other examining physician reports.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (doc. #29) is denied; plaintiff's motion for summary judgment (doc. #24) is granted. The Court remands this case for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 U.S.C. §405(b). We express no view as to the proper determination of this matter on remand.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 16, 2009